DILLINGHAM & MURPHY, LLP
WILLIAM F. MURPHY, ESQ. (SBN 82482)
JOHN N. DAHLBERG, ESQ. (SBN 85122)
J. CROSS CREASON, ESQ. (SBN 209492)
353 Sacramento Street, Suite 2000
San Francisco, California 94111
Telephone:    (415) 397-2700
Facsimile:    (415) 397-3300
wfm@dillinghammurphy.com
jnd@dillinghammurphy.com
jcc@fillinghammurphy.com

Attorneys for Defendant
SAFEWAY INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA JACKSON and KHUZEMA SAVAI, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>SAFEWAY INC., a Delaware Corporation with its Principal Place of Business in Pleasanton, California,<br><br>        Defendants | CASE NO.  3:15-cv-04419-JSC<br><br>**DECLARATION OF CHARLES E. RUSSO, JR. IN SUPPORT OF DEFENDANT SAFEWAY INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:  August 25, 2016**<br>**Time:  9 A.M.**<br>**Courtroom: F, 15th Floor** |

I, <u>CHARLES E. RUSSO, JR.</u>, declare:

1.      I am employed with <u>MARKETOUCH MEDIA, INC.</u> ("MarkeTouch") as its President. I make this Declaration in connection with the motion of defendant <u>SAFEWAY INC.</u> ("Safeway") for summary judgment. If called as a witness, I could and would testify to the matters set forth herein based on my personal knowledge.

2.      In late September 2014, MarkeTouch and Safeway entered into an RxTouch Service Agreement ("Agreement"), pursuant to which MarkeTouch agreed to provide outbound notification services to Safeway using MarkeTouch's platform and reporting services for flu shot reminder calls. As part of the Agreement, Safeway and MarkeTouch entered into a "Business Associate Agreement" to safeguard Protected Health Information ("PHI") that would be provided by Safeway to MarkeTouch, primarily, the telephone numbers of Safeway pharmacy patients. A true and correct copy of the Agreement, including the Business Associate Agreement, is attached hereto as **Exhibit B**.

3.      The Safeway outbound notification service provided by MarkeTouch began in November 2014. Safeway provided MarkeTouch with lists of telephone numbers it wanted to call with its pre-recorded flu shot reminder messages. MarkeTouch Media's integrated communication service then delivered pre-recorded voice messages to those telephone numbers. As the calls were placed, MarkeTouch's reporting package accurately tracked the results of the Safeway calls, providing data concerning the telephone numbers called, such as the date and time of each call (the time recorded was Dallas/Central Standard time), and the outcome of each call (i.e., whether the call was answered by a person, by an answering machine, did not answer, or some other issue). Safeway flu shot campaign calls were made through the MarkeTouch platform on November 6, 2014, November 7, 2014, and on January 9, 2014.

4.      I have reviewed the lists of telephone numbers provided by Safeway to the MarkeTouch outbound call platform to be placed in November 2014 and in January 2015. The telephone number 510-213-████ (the telephone number I have been advised by Safeway counsel

is the mobile telephone number used by Plaintiff <u>LINDA JACKSON</u> ("Plaintiff")) was on those lists as a number to be called as part of the Safeway 2014-2015 flu shot campaign.

     5.     I have also reviewed MarkeTouch's call tracking reports for the Safeway flu shot campaign in 2014-2015, which were the product of MarkeTouch's reporting package mentioned in paragraph 3 of this Declaration. The call tracking reports were prepared at or near the time of the events they reflect, in the ordinary course of MarkeTouch's business activities. They are, in my experience, accurate, and accurately record the results of phone calls placed through the MarkeTouch platform.

     6.     Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the MarkeTouch tracking reports for Safeway's 2014-2015 flu shot campaign (except that the tracking numbers at the bottom, e.g., SFWY000159, are additions to the record). Exhibit C reflects that Safeway called 510-213-███ through the MarkeTouch platform on only two occasions: on November 6, 2014, at approximately 7:19 P.M. Dallas time (the call was successfully placed, and was answered by a machine, i.e., either an answering machine or a voicemail box); and, on January 9, 2015, at approximately 7:04 P.M. Dallas time (the call was successfully placed, and was answered by a machine, i.e., either an answering machine or a voicemail box). The MarkeTouch call tracking reports reflect no other call to 510-213-███ other than on the two occasions stated.

     I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct. Dated this 20th day of July, 2016.


               _/s Charles E. Russo /s_____
                  Charles E. Russo

EXHIBIT B

## RxTOUCH SERVICE AGREEMENT

**RxTOUCH SERVICE AGREEMENT** (this "Agreement") by and between **MarkeTouch Media, Inc.,** a Texas corporation ("MarkeTouch"), with its principal place of business located at 5718 Westheimer Road, Suite 980, Houston, TX 77057, and **Safeway Inc.,** a Delaware corporation ("Client"), with its principal place of business located at 5918 Stoneridge Mall Rd, Pleasanton, CA, 94588. MarkeTouch and Client are sometimes referred to herein as a "Party" or collectively as the "Parties." This Agreement shall be deemed made as of the later date of a Party's signature on the signature page of this Agreement, but in all cases deemed effective as of October 1, 2014 (the "Effective Date").

The Parties hereto agree as follows:

1.     Services. During the Term (as defined below), MarkeTouch shall perform (or cause its affiliates or agents to perform) for Client the services described on Exhibit A attached hereto (the "Services"), subject to the terms and conditions of this Agreement. Exhibit A may be amended or supplemented by agreement of the Parties from time to time to reflect any additions or changes to the Services.

2.     Term.

(a)     General Term. The term of this Agreement (the "Term") shall commence on the Effective Date and shall remain in effect for one year following the Effective Date. The Term shall automatically renew for successive one-year periods on each anniversary of the Effective Date unless either Party provides the other Party written notice at least 60 days prior to the expiration of the then current Term stating that such Party is terminating this Agreement at the expiration of such current Term.

(b)     Permitted Early Termination.

(i) General. A Party may terminate this Agreement prior to the expiration of the Term set forth in Section 2(a) upon the occurrence of any of the following:  (A) if the non-terminating Party breaches any of its material agreements or obligations under this Agreement (other than the payment of Service Fees, which is covered in Section 2(b)(ii)) and such breach remains uncured more than 30 days after receiving written notice specifying the material breach, provided, that, a Party may not terminate this Agreement under this Section 2(b)(i)(A) if it is then in breach under this Agreement in any respect; (B) the non-terminating Party provided materially false or misleading information in writing during the origination and negotiation of this Agreement and such information was given by the non-terminating Party with the intent to induce the terminating Party into entering into this Agreement; (C) if a change in applicable law prevents the terminating Party from (or otherwise substantially increases the costs of the terminating Party in) performing any of its significant obligations under this Agreement other than the payment of money (for the avoidance of doubt, this clause (C) shall not apply to changes in tax laws); or (D) the non-terminating Party is unable to pay its debts generally as they come due, is declared insolvent or bankrupt, dissolves, is the subject of any proceedings relating to its bankruptcy, liquidation, insolvency, dissolution, bankruptcy-related reorganization, winding up

or the appointment of a receiver, trustee, custodian, liquidator or similar officer for a significant portion of its assets, or makes an assignment for the benefit of its creditors.

(ii)     MarkeTouch.  Additionally, MarkeTouch may terminate this Agreement prior to the expiration of the Term set forth in Section 2(a) if Service Fees (as defined below) remain unpaid after an Invoice Payment Date (as defined below) and such Service Fees continue to remain unpaid more than ten (10) Business Days after written demand from MarkeTouch after such Invoice Payment Date.

Any termination under this Section 2(b) shall be effective upon written notice to the non-terminating Party which (x) must be given after the event or condition triggering the termination in this Section 2(b) has occurred and (y) must specify that this Agreement is being terminated based on the occurrence of such triggering event or condition.

(c)     Termination Matters.  Notwithstanding anything to the contrary contained in Sections 2(a) or 2(b), (i) the provisions of Sections 2(c), 2(d), 4, 5, 8, 10-22 shall survive any termination of this Agreement, (ii) if a Party properly terminates this Agreement under Section 2(b) because of a breach or other wrongful act of the non-terminating Party, such termination shall not preclude the terminating Party from pursuing any remedies permitted under this Agreement in respect of such termination, and (iii) Client shall not be relieved or released from unpaid Service Fees incurred prior to any termination of this Agreement.

(d)     Early Termination by Client.  If Client terminates this Agreement during the initial 12 months other than in full compliance with Sections 2(a) or 2(b)(i), then, in addition to (and without limiting) any other remedies MarkeTouch may have under this Agreement or applicable law in respect of such termination, Client shall pay MarkeTouch a termination fee on such date of termination equal to (1) the difference between the aggregate usage up to the date of termination and the annual usage commitment for the remainder of Term and (2) the aggregate of any monthly, quarterly, annual or other periodic fixed Service Fees (e.g., maintenance fees or development fees) that are owed for the remainder of the Term.

3.     Payment for Services.

(a)     Service Fees and Expenses.  Client agrees to pay MarkeTouch the fees and expenses set forth on Exhibit A attached hereto in consideration for the Services performed hereunder (collectively, "Service Fees").

(b)     Payment Terms.  MarkeTouch will invoice Client monthly for Service Fees owed during the prior month.  Other than payments which are due on another date (as set forth on Exhibit A), Services Fees shown as owing or due on a MarkeTouch invoice for Services must be paid to MarkeTouch within 30 days following receipt of such invoice by Client (the "Invoice Payment Date").  All payments owed to MarkeTouch shall be made in U.S. dollars.  Client shall have the right to dispute any items in an invoice within 30 days after MarkeTouch's delivery of such invoice.  For an item in an invoice to be properly disputed, the disputed item and the reasons for such dispute must be specifically and expressly set forth in writing and delivered to MarkeTouch within such 30 day period.  If MarkeTouch has not received full payment of an

invoice (other than any items being properly disputed in accordance with this Section 3(b)) on or before the Invoice Payment Date, then, at MarkeTouch's sole discretion and in addition to (and without limiting) any other remedies MarkeTouch may have under this Agreement or applicable law, MarkeTouch may, without any notice required to Client, (i) charge interest on the Service Fees unpaid as of the Invoice Payment Date at a per annum rate of 18%, compounded monthly, (ii) withhold or refuse to furnish Client data or reporting information in MarkeTouch's possession until all unpaid Service Fees are paid; and/or (iii) suspend any or all Services until all unpaid Service Fees are paid. Additionally, (x) if MarkeTouch suspends or delays any Service under this Section 3(b), then as a condition to MarkeTouch recommencing any such suspended or delayed Service, Client shall pay MarkeTouch any reactivation fees (not to exceed $2,500.00 per reactivation) and late fees; and (y) Client shall pay all costs and expenses incurred by MarkeTouch in collecting unpaid Service Fees after the Invoice Payment Date (including, without limitation, reasonable attorney fees).

4.     Confidentiality.

       (a)     Definition. For purposes of this Agreement, a Party's "Confidential Information" shall mean confidential or proprietary information and/or trade secrets owned or possessed by, and/or regarding or pertaining to, such Party, including, without limitation, information and data regarding such Party, its business, its operations, its assets, its financial results and/or position, its prospects, its Intellectual Property (as defined below), its customers, its distributors, its suppliers, its employees, its contracts or agreements and its other commercial relationships. For the avoidance of doubt, Confidential Information shall include (i) any confidential or proprietary information (or trade secrets) of a third party of which a Party is in possession; (ii) any data, reports, records, verbal communications and/or other materials containing or reflecting Confidential Information (whether in tangible, written, oral, digital or electronic form or gathered by observation) and all copies, notes, analyses, compilations, studies, projections, correspondence, summaries or other documents derived or prepared therefrom; and (iii) the existence and terms of this Agreement and the Parties' relationship hereunder. Confidential Information shall not include any information of a Party (x) known generally by the public other than as a result of disclosure by or on behalf of the other Party hereto (or its representative or agent) or a breach of another person's or entity's confidentiality obligations or (y) independently developed by the other Party.

       (b)     Confidentiality Obligation. Each Party covenants and agrees to, and shall cause its agents, representatives, affiliates, officers and employees to, (i) treat and hold in confidence the Confidential Information of the other Party which comes into its possession by virtue of this Agreement (whether before or after the Effective Date) and (ii) not, directly or indirectly, (A) disclose, publish or otherwise make available to the public or to any person or entity any of such Confidential Information or (B) use any of such Confidential Information for its own benefit or for the benefit of any other person or entity. To the extent a Party obtains another Party's Confidential Information by virtue of this Agreement (whether before or after the Effective Date), the receiving Party shall (x) use such disclosing Party's Confidential Information solely for performing its obligations under this Agreement and (y) safeguard the disclosing Party's Confidential Information to the same extent that it safeguards its own Confidential Information, but no less than a reasonable degree of care. If a Party is required by governmental or judicial

3

process or subpoena to disclose the other Party's Confidential Information, the receiving Party shall cooperate with the disclosing Party in obtaining a protective order if the disclosing Party is seeking to obtain a protective order. Each Party acknowledges and agrees that, by virtue of this Agreement, it has had and/or may have access to the other Party's Confidential Information which if disclosed or made public (except as required or permitted under this Agreement) would irreparably harm such disclosing Party.

(c)     Survival of Termination.  All confidentiality obligations in this Agreement shall survive any termination of this Agreement.  Subject to the foregoing, following termination of this Agreement, each Party shall maintain any physical embodiments of the other Party's Confidential Information in its possession in accordance with the receiving Party's then prevailing document retention policy.

(d)     Retention of Ownership of Confidential Information.   Notwithstanding the foregoing, any Confidential Information of a Party used or disclosed in connection with this Agreement or the transactions contemplated hereby shall remain the exclusive Confidential Information of the disclosing Party.

5.     Intellectual Property.

(a)     Definition.  For purposes of this Agreement, a Party's "Intellectual Property" shall mean such Party's ownership interests (and such Party's other rights) in and to its patents, inventions, discoveries, applications, copyrights, trademarks, service marks, software (including, without limitation, source code and applications), hardware, processes, methods, practices, developments, know-how, data, trade secrets, marketing materials, customer lists and identifying information, technology, websites, Confidential Information and all other intellectual property.

(b)     Retention of Intellectual Property Rights.  Except as expressly set forth in Section 5(c), no Party is transferring, assigning or licensing any of its Intellectual Property rights (whether by ownership, license or otherwise) to the other Party by virtue of this Agreement, and each Party shall expressly retain all of its Intellectual Property rights as well as rights in and to improvements or developments on or with respect to such Intellectual Property (irrespective of whether such Intellectual Property rights were disclosed or revealed to the other Party in connection with this Agreement).

(c)     MarkeTouch Use of Client Intellectual Property.  Client will provide MarkeTouch with the Intellectual Property of Client necessary or required for MarkeTouch to perform the Services hereunder (including, without limitation, data marketing materials, customer lists, customer identifying data (e.g., phone numbers, fax numbers and e-mail addresses, where applicable) and Client methods, practices and processes).  MarkeTouch acknowledges and agrees that it only has the right to use such Intellectual Property of Client in the performance of Services hereunder, and is not acquiring any ownership, license or other right in or to Client's Intellectual Property or any improvements or developments thereunder.  In rendering the Services, MarkeTouch may receive from or transmit to Client "protected health information" within the meaning of the regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the Health Information Technology for Economic

4

and Clinical Health Act ("HITECH"), as amended from time to time, and, accordingly, the Parties hereby agree to execute the Business Associate Agreement set forth in Exhibit B hereto.

    (d)    MarkeTouch Services. For the avoidance of doubt, all Intellectual Property of MarkeTouch used in connection with the performing of Services (including, without limitation, scripts, software, source code, software applications, voice messaging, text messaging, recordings and related materials), and all improvements, developments and applications of MarkeTouch Intellectual Property, shall remain the exclusive property and Intellectual Property of MarkeTouch. In the event that MarkeTouch develops or uses an application or other process (or other method for gathering or manipulating data or information) for Client using MarkeTouch software or other MarkeTouch Intellectual Property, then the application or other process or method (and any improvements or developments) shall remain the exclusive property and Intellectual Property of MarkeTouch, but any Client data, Client customer information, Client Confidential Information or Client Intellectual Property that is inputted into the application, process or method, as well as the resulting Client data, Client customer information or Client reports that are generated from the application, process or method, shall be the exclusive property of Client.

6.     MarkeTouch Representations and Warranties.

    (a)    General.

       (i)    MarkeTouch hereby represents and warrants to Client that MarkeTouch has the corporate or organizational power and authority to enter into, and perform its obligations under, this Agreement;

       (ii)    MarkeTouch hereby represents and warrants to Client that MarkeTouch's execution and delivery of this Agreement and the performing of its obligations hereunder will not conflict with any other agreements, documents or instruments entered into by MarkeTouch where the result of such conflict would (A) materially interfere with MarkeTouch's obligations under this Agreement or (B) have a material adverse effect on the benefits Client is entitled to under this Agreement;

       (iii)    MarkeTouch hereby represents and warrants to Client that this Agreement is the legal, valid and binding obligation of MarkeTouch, enforceable against MarkeTouch in accordance with its terms;

       (iv)    MarkeTouch hereby represents and warrants to Client that to MarkeTouch's knowledge: (A) MarkeTouch owns or has the right to use the Intellectual Property of MarkeTouch that it is using in performing Services under this Agreement for the purposes contemplated by this Agreement, and (B) no court having jurisdiction over MarkeTouch has adjudicated that MarkeTouch's Intellectual Property that it is using in performing Services under this Agreement infringes upon another person's or entity's Intellectual Property; and

(v)     MarkeTouch hereby represents, warrants and covenants to Client that MarkeTouch will comply with all applicable laws (other than telemarketing laws, which are covered by Section 6(b)); provided, however, MarkeTouch will have no liability or obligation for any violation of an applicable law that results from or is caused by Client's violation of such law.

(b)     <u>Telemarketing Law Compliance</u>. The Federal Telephone Consumer Protection Act of 1992 (the "<u>TCPA</u>"), the regulations of the Federal Communication Commission and the Federal Trade Commission's Telemarketing Sales Rule ("<u>TSR</u>") impose requirements on the use of telecommunications for marketing products and services. MarkeTouch represents, warrants and covenants to Client that MarkeTouch will comply with the requirements of TCPA, TSR and any other U.S. federal statute, rule or regulation applicable to telemarketing or telesales (collectively, "<u>Telemarketing Laws</u>") , provided, however, MarkeTouch shall have no liability or obligation for any violation of any Telemarketing Law that results from or is caused by (i) Client's violation of such Telemarketing Law, (ii) Client's violation of any applicable consumer, information or privacy law (including, without limitation, HIPAA), or (iii) Client's breach of its representation, warranty and covenant in Section 7(b).

(c)     <u>Limitations</u>. Except for the representations and warranties expressly set forth above, MarkeTouch is not making any representations or warranties under this Agreement or with respect to the Services (whether express, implied, statutory or otherwise, including, without limitation, those arising out of a course of dealing or trade, non-infringement, merchantability or fitness for a particular purpose). Without limiting the foregoing, Client acknowledges and agrees that MarkeTouch is not promising or guaranteeing any financial results, increase in sales of Client services or products or other positive impact on Client by virtue of the Services.

7.     <u>Client Representations and Warranties</u>.

(a)     <u>General</u>.

(i)     Client hereby represents and warrants to MarkeTouch that Client has the corporate or organizational power and authority to enter into, and perform its obligations under, this Agreement;

(ii)     Client hereby represents and warrants to MarkeTouch that Client's execution and delivery of this Agreement and the performing of its obligations hereunder will not conflict with any other agreements, documents or instruments entered into by Client where the result of such conflict would (A) materially interfere with Client's obligations under this Agreement or (B) have a material adverse effect on the benefits MarkeTouch is entitled to under this Agreement;

(iii)     Client hereby represents and warrants to MarkeTouch that this Agreement is the legal, valid and binding obligation of Client, enforceable against Client in accordance with its terms;

(iv)     Client hereby represents and warrants to MarkeTouch that to Client's knowledge, (A) Client owns or has the right to use the Intellectual Property and other materials

6

of Client that it is providing MarkeTouch for use in performing Services under this Agreement, and (B) no court having jurisdiction over Client has adjudicated that Client's Intellectual Property and/or other materials of Client that it is providing MarkeTouch for use in performing Services under this Agreement infringes upon another person's or entity's Intellectual Property; and

(v)     Client hereby represents, warrants and covenants to MarkeTouch that Client will comply with all applicable laws; provided, however, Client will have no liability or obligation for any violation of an applicable law that results from or is caused by MarkeTouch's violation of such law (other than any violation of a telemarketing law by MarkeTouch that is caused by a breach of any of Client's representations, warranties or covenants in this Agreement).

(b)     Character of Client Customers. Client represents, warrants and covenants to MarkeTouch that the notifications, communications and messages (including, without limitation, telephone calls, faxes, e-mails, text messages and recordings) (collectively, "Notifications") to be delivered under this Agreement, whether by MarkeTouch or Client, will be delivered exclusively to Client's customers and will be "healthcare" or "informational" in nature (as permitted by 16 C.F.R. Part 310 of the FCC's TSR and in accordance with other applicable Telemarketing Laws) ("Permissible Calls"). Additionally, Client represents, warrants and covenants to MarkeTouch that Client customer information and identifying data provided to MarkeTouch are exclusively for individuals who are not on Client's internal "do not call list" or "do not contact list" (i.e., Client customers who have requested not to receive Notifications). Client further understands that the TSR and/or other Telemarketing Laws may be modified in the future to prohibit currently Permissible Calls, and will comply with any such modifications. Client hereby waives any claims against MarkeTouch arising from Client's failure to comply with this Section 7(b).

(c)     Individually Identifiable Information. Client represents, warrants and covenants to MarkeTouch that all individually identifiable information of recipients of Notifications under this Agreement (including, without limitation, names, phone numbers, addresses, email addresses and other information) which has been provided, sent, transmitted or delivered by or on behalf of Client to MarkeTouch will be accurate and complete, and that all such recipients are customers of Client.

(d)     Limitations. Except for the representations and warranties expressly set forth above, Client is not making any representations or warranties under this Agreement (whether express, implied, statutory or otherwise, including, without limitation, those arising out of a course of dealing or trade, non-infringement, merchantability or fitness for a particular purpose).

8.     Indemnification.

(a)     MarkeTouch Indemnification. MarkeTouch shall indemnify, defend and hold harmless Client and its officers, directors, employees, owners and representatives (collectively, "Client Indemnified Parties") against all liabilities, losses, damages, claims, suits, investigations, proceedings, costs, expenses (including, without limitation, reasonable attorney fees), judgments,

settlements, interest and penalties (collectively, "Losses") incurred by the Client Indemnified Parties as a result of MarkeTouch's breach or default under this Agreement.

(b) Client Indemnification. Client shall indemnify, defend and hold harmless MarkeTouch and its officers, directors, employees, owners and representatives (collectively, "MarkeTouch Indemnified Parties") against all Losses incurred by the MarkeTouch Indemnified Parties as a result of Client's breach or default under this Agreement.

(c) Limitations. Absent willful misconduct or fraud by an indemnifying Party, in no event shall the indemnifying Party be liable under this Agreement for any special, punitive, incidental, indirect, consequential, or exemplary damages.

9. Force Majeure. Each Party hereto shall be excused from performing any obligations under this Agreement, in whole or in part, if performance is impossible or substantially impracticable as a result of an act of God, terrorism, national emergency, war, labor dispute, strike, flood, lightning, severe weather, shortage of materials, failure or fluctuations in electrical power, heat, light, air conditioning or other public utility, disruption of a line, service or program by a common carrier or billing services provider, disruption or malfunction of any data processing or telecommunications network, facility or equipment, third party non-performance, or other cause beyond a Party's reasonable control, until such time as such event or condition no longer prevents performance of such obligations, and such nonperformance shall not be deemed a default or breach hereunder or a basis for termination hereof.

10. Responsibilities for Employees and Representatives. Each Party shall remain solely liable for the payment of all compensation and benefits to its respective employees who may assist in performing such Party's obligations under this Agreement, as well as for the supervision, hiring and firing, and withholding of any taxes of or in respect of such Party's employees. Each Party shall be responsible for the actions and omissions of its employees, agents, affiliates and representatives with respect to the performance of any of its obligations under this Agreement.

11. No Partnership. Each Party shall be deemed an independent contractor, and nothing shall create, construe or imply a partnership, joint venture, employment, principal and agent or similar relationship between the Parties by virtue of this Agreement.

12. Notices. All notices, requests, and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively delivered to and received by a Party: (a) upon personal delivery; (b) five business days after having been sent by certified United States postal mail with return receipt requested to such party's address; or (c) on the day of delivery if delivered by nationally recognized overnight courier with confirmation of delivery to such party's address. Any communication to a Party shall be sent to the address set forth on the signature page to this Agreement. Each Party may, by giving written notice to each other Party, designate additional or different mailing addresses for delivery of communications hereunder. Notwithstanding this Section 12, MarkeTouch invoices may be delivered by email to such email address(es) as directed by Client, and shall be deemed delivered to and received by Client upon MarkeTouch sending any invoice by email to such email address(es).

13.    Assignability. Except as expressly permitted in the following sentence, this Agreement shall not be assigned by any Party without the express prior written consent of the other Party. A Party may assign this Agreement in full to a successor-in-interest to its business or business unit by virtue of sale, merger, reorganization or similar transaction without the other Party's consent (a "Permitted Assignment"); provided, however, (a) nothing shall relieve a Party from any liability, duty or obligation under this Agreement by virtue of any Permitted Assignment and (b) as a condition to the effectiveness of any Permitted Assignment, all successors to all or any part of a Party's business or business unit shall be jointly and severally responsible for all liabilities, duties and obligations of such Party under this Agreement. Any attempted assignment in violation of this Section shall be null and void. This Agreement shall inure to the benefit of and be binding on the Parties and their respective successors and permitted assigns.

14.    Amendment; Waiver. This Agreement may be amended, supplemented, waived or otherwise modified only by a written instrument executed by the Parties. No waiver by a Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the Party so waiving. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or performance. No delay or omission on the part of any Party in exercising any right, power or privilege under this Agreement will operate as a waiver thereof. The rights and remedies provided in this Agreement are cumulative and are in addition to all rights or remedies that a Party otherwise may have in law or in equity or by statute or otherwise.

15.    No Third-Party Beneficiaries. Nothing herein shall create or establish any third-party beneficiary hereto nor confer upon any person or entity not a Party to this Agreement any rights or remedies of any nature or kind whatsoever under or by reason of this Agreement.

16.    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas applicable to a contract executed and performed in such State without giving effect to the conflicts of laws principles thereof.

17.    Waiver of Jury Trial. The Parties waive, to the fullest extent permitted by applicable law, trial by jury in any suit, action or proceeding with respect to, in connection with, or arising out of this Agreement or any transaction contemplated hereby.

18.    Enforcement Expenses. If any suit, action or proceeding at law or in equity is necessary to enforce or interpret the terms of this Agreement or the transactions contemplated hereby, the prevailing Party shall be entitled to reasonable attorneys' fees and costs in addition to any other relief to which such Party may be entitled.

19.    Change In Law. Upon the enactment after the Effective Date of any new law or a change in any existing law (other than any new, or change to, any tax law) (collectively, a "Change in Law") that applies to a Party's obligations under this Agreement, that: (i) renders this Agreement illegal, (ii) materially changes the obligations of or benefits to the Parties, or (iii) subjects a Party to material regulatory risk or creates a significant risk of regulatory or civil penalties, as determined by the written opinion of outside counsel for the Party asserting that there has been a

Change in Law, the Parties shall (a) in good faith, determine whether any immediate action must be taken in order to avoid incursion of civil or criminal liability of any kind by either Party as a result of the Change in Law; and (b) use commercially reasonable efforts to mutually agree to such amendments to the Agreement as to permit its valid and legal continuation and to preserve the anticipated benefits of the Parties hereunder. If the Parties are unable to reach agreement on such amendments within 60 days of such notice of an applicable Change in Law, either Party may terminate its participation in this Agreement by giving 30 days written notice of such termination to the other Party.

20.    Entire Agreement.  This Agreement (including any Exhibits and Schedules) sets forth the entire understanding of the Parties hereto and supersede all prior agreements whether written or oral relating to the same subject matter.

21.    Severability.  If any provision of this Agreement shall be declared by any court to be illegal, void or unenforceable, all other provisions of this Agreement shall not be affected and shall remain in full force and effect.  If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable.

22.    Business Day.  For purposes of this Agreement, "business day" or "Business Day" means a day on which the New York Stock Exchange is open for trading.

23.    Signatures.  This Agreement may be executed in multiple counterparts, each of which will constitute, for all purposes, original documents.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

# (S)SAFEWAY

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as of the date first above written.

MarkeTouch Media, Inc.

By: _Charles E Russo_ Pr.

Name: Charles E. Russo
Title: CEO & President

Address: 5718 Westheimer Road
Suite 980
Houston, TX 77057

Date: _9/25/2014_

Safeway Inc.

By: _James McCabe_

Name:
Title: James McCabe
Director - Patient Care

Address: 5918 Stoneridge Mall Rd,
Pleasanton, CA, 94588

Date: September 24th 2014



## Exhibit A

### Services and Service Fees

## OUTBOUND NOTIFICATIONS

MarkeTouch will provide outbound notification service to Client including but not limited to creative consultation, technical development, data processing in accordance with MarkeTouch's internal Compliance Policy, outbound notification delivery via MarkeTouch's platform, reporting and telephone call billing services reasonably required by Client within the scope of this Agreement. Client will have access to online reporting and the ability to manually launch outbound Notification campaigns via MarkeTouch's online portal. If required, MarkeTouch will provide User ID's and passwords at Client's request. It is the Client's responsibility to protect all User ID's and passwords. All campaigns must comply with this Agreement (including, Section 7(b-c)).

## OPT-OUT SERVICES

MarkeTouch will provide an inbound toll-free service or web-portal for the purpose of removing Client's customers from receiving future Notifications.

### Service Fees

**Initial Development Fee:**     **WAIVED**
Includes; marketing interview and other consultation to determine strategy and program design in accordance with Client goals, a creative brief including strategy, scripting, dial volume, initial voice recordings and voice talent recommendations, technical integration with Client software, dial summary & detailed reports, initial customized reports, campaign summary, recommendations for future programs, development/implementation of text campaign utilizing the SMS Gateway, and development and implementation of opt-out service.

**Monthly Maintenance:**     **$500.00**
Includes ongoing management and consulting of campaign(s), shared use of SMS Gateway short code, Opt-out Service & calls to the inbound toll-free Opt-Out service.

**Cost per Notification:**     **$0.05**
Voice up to 30 seconds – Text & e-mail up to 140 characters. Annual minimum commitment of 250,000 notifications

**Voice Talent:**     **$50.00**
per recorded message (English & Spanish)



## BUSINESS ASSOCIATE AGREEMENT

**Health Insurance Portability and Accountability Act (HIPAA) Compliance**

This Business Associate Agreement (the "Agreement") is effective October 1, 2014 ("Effective Date"), between Safeway, Inc. ("Covered Entity") and MarkeTouch Media, Inc. ("Business Associate").

### Recitals

The parties anticipate that due to the nature of their business relationship Covered Entity may make available and/or transfer to Business Associate information that includes or constitutes Protected Health Information ("PHI") (as defined below).

The parties desire to protect the privacy and security of all such Protected Health Information in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, Public Law 111-5 ("HITECH"), and the regulations promulgated there under, and the purpose of this Agreement is to ensure such compliance.

The HIPAA Rules provide that certain of the standards, requirements and implementation specifications of the HIPAA Privacy, Security, Breach Notification and Enforcement Rules, as amended by the HITECH Act shall apply to Business Associates in the same manner that such sections apply to Covered Entities. Those Sections include, without limitation, Sections 164.308, 164.310, 164.312, and 164.316 of Title 45, Code of Federal Regulations, shall apply to Business Associate in the same manner that such sections apply to Covered Entity; and the additional requirements of the HITECH Act that relate to privacy and that are made applicable with respect to covered entities shall also be applicable to Business Associate and shall be and by this reference hereby are incorporated into the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

1. **DEFINITIONS**

a. **"Breach"** means the acquisition, access, Use, or disclosure of Protected Health Information in a manner not permitted under the HITECH Act and Regulations which compromises the security or privacy of the Protected Health Information.

b. **"Business Associate"** shall have the meaning described at 45 CFR §160.103, and in reference to the party to this Agreement shall mean MarkeTouch Media, Inc.

c. **"Covered Entity"** shall have the meaning described at 45 CFR §160.103, and in reference to the party to this Agreement, shall mean Safeway, Inc.

d. **"Covered Functions"** means those functions of a covered entity the performance of which makes the entity a health plan, health care provider, or health care clearinghouse.

e. **"Designated Record Set"** means a group of records maintained by or for the Covered Entity that is (i) the medical records and billing records about Individuals maintained by or for the Covered Entity; (ii) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for the Covered Entity; or (iii) Used, in whole or in part, by or for the Covered Entity to make decisions about Individuals. As used herein the term "Record" means

# (S) SAFEWAY

any item, collection, or grouping of information that includes PHI and is maintained, collected, Used or disseminated by or for Covered Entity.

f.  **"Electronic Data Interchange (or "EDI") Rule"** means the Standards for Electronic Transactions as set forth as 45 CFR §§ 162.100 *et seq.,* as the same may be amended from time to time.

g.  **"Electronic Health Record"** means an electronic record of health-related information on an individual that is created, gathered, managed, and/or consulted by authorized health care clinicians and staff.

h.  **"Electronic Protected Health Information" (or "EPHI")** means Protected Health Information which is transmitted by or maintained in Electronic Media as defined in 45 CFR § 160.103.

i.  **"HIPAA Rules"** means the Privacy, Security, Breach Notification, and Enforcement Rules found at Title 45, Parts 160 and 164 of the Code of Federal Regulations, as the same may be amended from time to time.

j.  **"HITECH Act and Regulations"** means the Health Information Technology for Economic and Clinical Health Act, passed as part of the American Recovery and Reinvestment Act of 2009, and its implementing regulations found at Title 45, Parts 160 and 164 of the Code of Federal Regulations, as the same may be amended from time to time.

k.  **"Individual"** means the person who is the subject of the Protected Health Information or such person's personal representative in accordance with 45 CFR § 164.502(g).

l.  **"Minimally Necessary"** means when using or disclosing Protected Health Information, Covered Entity and Business Associate shall make reasonable efforts to limit the quantity and type of Protected Health Information Used or Disclosed to the minimum necessary to accomplish the intended purpose of the Use or Disclosure, in accordance with 45 CFR § 164.514(d)(1). Covered Entity and Business Associate acknowledge that the phrase "minimum necessary" shall be interpreted in accordance with the HITECH Act and government guidance on the definition.

m.  **"Protected Health Information" (or "PHI")** means information created or received by Business Associate from or on behalf of Covered Entity for the performance of Covered Functions, whether such information is oral or recorded in any form or medium, including but not limited to electronic form, and which: (i) relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual; and (ii) identifies the individual or, with respect to which, there is a reasonable basis to believe the information can be used to identify the Individual. Protected Health Information includes without limitation, Electronic Protected Health Information.

n.  **"Secretary"** means the Secretary of the Department of Health and Human Services ("HHS") and any other officer or employee of HHS to whom the authority involved has been delegated, specifically including, but not limited to, the Office for Civil Rights.

o.  **"Security Incident"** means the attempted or successful unauthorized access, Use, disclosure, modification, or destruction of information or interference with system operations in an information system.

p.  **"Subcontractor"** means a person to whom a Business Associate delegates a function, activity or service, other than in the capacity of a member of the workforce of the Business Associate. (45 CFR §160.103)

# (S) SAFEWAY

q. **"Unsecured Protected Health Information"** means protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary in the guidance issued under Section 13402(h)(2) of the HITECH Act, which may be found at 74 Fed. Reg. 19006 (Apr. 27, 2009).

r. Capitalized terms used but not otherwise defined in this Agreement will have the meanings set forth in HIPAA, the HIPAA Privacy and Security Rules and the HITECH Act and Regulations.

## 2. PERMITTED PURPOSES FOR USE OR DISCLOSURE OF PHI

Subject to the terms and conditions of this Agreement, Business Associate is permitted to Use and/or Disclose PHI under this Agreement only as Minimally Necessary to perform Covered Functions on behalf of Covered Entity or as Required by Law.

## 3. OBLIGATIONS OF BUSINESS ASSOCIATE

a. **Limits On Use And Further Disclosure.** Business Associate will not Use or Disclose any PHI in a manner that would violate the Privacy Rule if done by Covered Entity, except such Uses or Disclosures as permitted or required by this Agreement, or as Required by Law. Without limiting the generality of the foregoing, Business Associate is permitted to: (1) Use PHI for the proper management and administration of Business Associate; (ii) Use and Disclose PHI to carry out the legal responsibilities of Business Associate, provided that with respect to any such Disclosure either: (a) the Disclosure is Required by Law; or (b) Business Associate obtains a written agreement from the person to whom the PHI is to be Disclosed that such person will hold the PHI in confidence and will not Use and further Disclose such PHI except as Required by Law and for the purpose(s) for which it was Disclosed by Business Associate to such person, and that such person will notify Business Associate of any instances of which it is aware in which the confidentiality of the PHI has been breached; and (iii) Use PHI for Data Aggregation purposes in connection with the Health Care Operations of Covered Entity.

b. **Appropriate Safeguards.** Business Associate will establish and maintain appropriate safeguards and security measures and comply with Subpart C of 45 CFR Part 164, otherwise known as the Security Standards for the Protection of Electronic Protected Health Information, to prevent any Use or disclosure of PHI other than as permitted by this Agreement or Required by Law.

c. **Reports of Improper Use or Disclosure; Reports of Breach.** Business Associate agrees that it will report to Covered Entity, within three business (3) days of discovery, any Use or Disclosure of PHI of which it becomes aware which is not provided for or permitted by this Agreement or applicable Law. Business Associate further agrees that it will report to Covered Entity, within three business (3) days of discovery, any Breach of Unsecured Protected Health Information as required at 45 CFR section 164.410. Notwithstanding the foregoing, Business Associate and Covered Entity acknowledge the ongoing existence and occurrence of attempted but ineffective security incidents that are trivial in nature, such as pings and other broadcast service attacks, and Covered Entity acknowledges and agrees that this section shall constitute notice, and no additional notification to Covered Entity of such ineffective security incidents is required, provided that no such incident results in unauthorized access, Use or Disclosure of PHI. Business Associate shall investigate the circumstances of the incident upon request by Covered Entity, reasonably cooperate with any investigation of the improper Use or Disclosure or Breach of Unsecured Protected Health Information, and reasonably assist Covered Entity in complying with any notification procedures required by applicable state or federal law, including, without limitation, the HITECH Act and Regulations.

# ⑤ SAFEWAY

d. **Subcontractors and Agents.** In accordance with 45 CFR sections 164.502(e)(1) and 164.308(b)(2), if applicable, Business Associate will ensure that any agent or Subcontractor that creates, receives, maintains, or transmits PHI on behalf of the Business Associate agrees to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information. Business Associate will ensure that any agent or Subcontractor, of Business Associate to which it provides PHI is bound by a written business associate agreement that contains the same restrictions and conditions on the Use and Disclosure of PHI as this Agreement. Business Associate also will ensure that any such agent or Subcontractor agrees to implement reasonable and appropriate safeguards to protect any PHI received by such agent or Subcontractor. Business Associate will provide to any such agent or Subcontractor only the PHI Minimally Necessary to accomplish the purpose of the Subcontractor service agreement. In accordance with 45 CFR section 504(e)(1)(iii), if Business Associate, becomes aware of a pattern of activity or practice of an agent or Subcontractor that constitutes a material breach or violation of the agent or Subcontractor's obligation under the business associate agreement or other arrangement, then Business Associate must take reasonable steps to cure the breach or end the violation, as applicable, and, if such steps are unsuccessful, terminate the contract or arrangement if feasible.

e. **Right of Access to PHI.** At the written request of and in the time and manner reasonably directed by Covered Entity, but no later than ten business (10) days after any such request, Business Associate will provide access to and a right to copy PHI in a Designated Record Set, to Covered Entity or, as directed Covered Entity, to the Individual, in conformance with the requirements of 45 CFR §164.524 as amended by the HITECH Act and Regulations. Additionally, if the PHI is held in an Electronic Health Record, then the Individual shall have a right to obtain from Business Associate a copy of such information in an electronic format. In the event an Individual requests access to PHI directly from Business Associate, Business Associate will forward such request to Covered Entity within three business (3) days of receipt.

f. **Restriction Agreements and Confidential Communications.** Business Associate will comply with any agreement that Covered Entity makes that either (i) restricts Use or Disclosure of PHI pursuant to 45 CFR §164.522(a), or (ii) requires confidential communication about PHI pursuant to 45 CFR §164.522(b), provided that Covered Entity notifies Business Associate in writing of the restriction or confidential communication obligations that Business Associate must follow. Covered Entity will promptly notify Business Associate in writing of the termination of any such restriction agreement or confidential communication requirement and, with respect to termination of any such restriction agreement, instruct Business Associate whether any of the PHI will remain subject to the terms of the restriction agreement. Business Associate will comply with any restriction request provided to Business Associate in advance and in writing by Covered Entity: (i) except as otherwise Required By Law, the disclosure is to a health plan for purposes of carrying out payment or health care operations (and is not for purposes of carrying out treatment); and (ii) the PHI pertains solely to a health care item or service for which the health care provider involved has been paid out-of-pocket in full.

g. **Amendment and Incorporation of Amendments.** At the request of Covered Entity or of the Individual, Business Associate will make any amendments to PHI in a Designated Record Set that have been approved by Covered Entity in writing, in the time and manner designated by Covered Entity and in conformance with 45 CFR §164.526. Where the request for amendment of PHI in a Designated Record Set is made directly to Covered Entity and Business Associate maintains the subject PHI, Business Associate will forward the request to the Covered Entity within three business (3) days of receipt.

h. **Provide Accounting.** Business Associate will document and make available to Covered Entity the information requested by Covered Entity to respond to a request for an accounting of disclosures to the Individual in accordance with 45 CFR §164.528, as amended by the HITECH Act and Regulations. If the request is communicated to Business Associate directly by the



Individual, **Business Associate** shall forward such request to Covered Entity within three (3) business days of receipt. Such documentation will be made available within thirty (30) days of written notice of a request, in a manner satisfying the requirements of 45 CFR § 164.528, as amended. **Business Associate** will maintain such information necessary to account for disclosures and any written accounting that is provided to the Individual for at least six (6) years following the date of the accountable disclosure or three (3) years for disclosures related to an Electronic Health Record, starting with the date specified by HHS.

i. **Access to Books and Records.** Business Associate will make available to the Secretary of HHS or his/her designee (i) its internal practices and all books, and records relating to the Use or Disclosure of PHI, and (ii) policies, procedures and documentation relating to the safeguarding of EPHI for purposes of determining compliance with HIPAA and the regulations there under, as amended by the HITECH Act and Regulations. The internal practices, books, records, policies, procedures and documentation subject to this Section are those that relate to the Use and Disclosure of PHI or EPHI that is created by Business Associate on behalf of Covered Entity, received by Business Associate from Covered Entity, or received by Business Associate from a third party on behalf of Covered Entity. Within ten (10) days of receiving any request for access to such records from the Secretary or designee, Business Associate will notify Covered Entity of the request, unless prohibited by the Secretary.

j. **Security.** In its handling of EPHI, Business Associate agrees to the following obligations and activities regarding the security of EPHI:

    (1) Business Associate agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the security, confidentiality, integrity and availability of the EPHI, including protection against unauthorized access to or Use of such EPHI, that it creates, receives, maintains, or transmits on behalf of Covered Entity;

    (2) Business Associate agrees that it will secure all PHI by a technology standard that renders such PHI unusable, unreadable, or indecipherable to unauthorized individuals and is consistent with guidance issued by the Secretary specifying the technologies and methodologies that render PHI unusable, unreadable or indecipherable to unauthorized individuals.

    (3) Business Associate agrees to make its policies and procedures, and documentation required by the Security Rule relating to such safeguards, available to the Secretary for purposes of determining Covered Entity's compliance with the Security Rule; and

    (4) Business Associate agrees to ensure that any agent, including a Subcontractor, who creates, receives, maintains or transmits PHI or EPHI on behalf of Business Associate agrees to implement reasonable and appropriate safeguards and the same restrictions as Business Associate.

k. **Electronic Data Interchange (EDI) Transaction Standards.** Business Associate agrees that it will comply with all applicable EDI Rule standards, including but not limited to ASC X12 version 5010 and National Council for Prescription Drug Programs (NCPDP) version 5.1 to NCPDP version D.0 standard transaction and code sets requirements. Business Associate shall also comply with the National Provider Identifier requirements, if and to the extent that they are applicable.

l. **Prohibition on Marketing and Sale of Records.** Business Associate agrees not to Use or Disclose PHI or de-identified data for research or marketing purposes without first receiving prior written approval from Covered Entity and obtaining the necessary authorization from the Individual. Additionally, Business Associate shall not directly or indirectly receive remuneration in exchange for any PHI of an individual unless the Covered Entity or Business Associate obtained



from the Individual, in accordance with 45 CFR § 164.508, a valid authorization that includes a specification of whether the PHI can be further exchanged for remuneration by the entity receiving PHI of that Individual, except as otherwise allowed under the HITECH Act and Regulations.

m.  **Compliance with Other Aspects of Administrative Simplification Regulations.** Business Associate agrees that it will use its best efforts to comply with all applicable regulatory provisions in addition to the EDI Rule, HIPAA Privacy and Security Rules and HITECH Act and Regulations no later than the date such provisions become effective with regard to Business Associate.

n.  **Right to Audit.** Covered Entity will have the right, during the term of this Agreement, to audit PHI Business Associate maintains on behalf of Covered Entity to assure compliance with this Agreement and/or the HIPAA Privacy and Security Rules and HITECH Act and Regulations. In the event that Covered Entity reasonably determines there is lack of sufficient documentation and/or satisfactory processes in place to ensure such compliance, Covered Entity reserves the right to ask Business Associate to promptly rectify any non-compliance by a mutually agreed deadline.

o.  **Subpoena.** In the event Business Associate receives a subpoena for any of Covered Entity's PHI in Business Associate's possession, Business Associate shall notify Covered Entity and deliver a copy of the subpoena to Covered Entity, if such disclosure is not prohibited.

p.  **Mitigation Procedures.** Business Associate will mitigate, and cooperate with Covered Entity to mitigate, any harmful effect resulting from any Use or Disclosure of PHI or Breach of Unsecured PHI by Business Associate in violation of this Agreement, the HIPAA Privacy and Security Rules or the HITECH Act and Regulations.

q.  **Property Rights.** As between the Parties, all PHI hereunder is and will remain the property of Covered Entity. Business Associate agrees that it acquires no right, title or interest in the PHI, including any de-identified information, as a result of its relationship with Covered Entity.

4.  **OBLIGATIONS OF COVERED ENTITY**

a.  **Provision of Notice of Privacy Practices.** Covered Entity shall provide Business Associate with the Notice of Privacy Practices that Covered Entity produces in accordance with 45 CFR §164.520, as well as changes to such notice.

b.  **Permissions.** Covered Entity shall provide Business Associate with written notice of any changes in, or revocation of, permission by Individual to Use or Disclose PHI, if such change affects Business Associate's permitted or required Uses and Disclosures hereunder.

c.  **Restrictions.** Covered Entity shall notify Business Associate in writing of any restriction to the Use or Disclosure of PHI that Covered Entity has agreed to in accordance with 45 CFR §164.522.

5.  **INDEMNITY**

Each party shall indemnify, defend and hold harmless (the "Indemnifying Party") the other party and its agents, officers, directors, employees, successors and assigns, and each of them (the "Indemnified Parties"), from and against any and all third party claims, suits, actions and proceedings, liabilities, judgments, losses, damages, costs, charges, and expenses of whatever nature or character resulting from, arising out of or in connection with: (i) any breach of this Business Associate Agreement; (ii) any Breach of PHI as defined in 45 CFR section 164.402; and (iii) the performance of this Business Associate Agreement by the Indemnifying Party.

# ⑥ SAFEWAY

If any third party shall notify any Indemnified Party of any matter which may give rise to a claim for indemnification ("Third Party Claim"), the Indemnified Party shall promptly notify the Indemnifying Party thereof provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnified Party from any obligation hereunder, unless (and then solely to the extent) the Indemnifying Party is thereby prejudiced.

The Indemnifying Party will have the right to defend the Indemnified Party against the Third Party Claim with the counsel of the Indemnifying Party's choice so long as the Indemnifying Party notifies the Indemnified Party within thirty (30) days after the Indemnified Party has given notice of the Third Party Claim that the Indemnifying Party will indemnify the Indemnified Party to the fullest extent provided by the provisions of this paragraph.

6.  **TERM & TERMINATION**

a.  **Term.** This Agreement shall commence as of the Effective Date and shall continue for so long as Business Associate provides agreed upon services to or on behalf of Covered Entity and shall terminate when all of the PHI provided by Covered Entity to Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is infeasible to return or destroy PHI, protections are extended to such information, in accordance with the termination provisions in this Section 6.

b.  **Termination for Cause.** In accordance with 45 CFR § 164.504(e)(1)(ii), as amended by the HITECH Act and Regulations, which make such provision apply to covered entities and Business Associates equally, upon Covered Entity's or Business Associate's knowledge (the foregoing collectively, "Terminating Party") of a material breach by Business Associate or Covered Entity (the foregoing collectively, Breaching Party"), Terminating Party shall either:

    (1)    Provide a reasonable period, not to exceed thirty (30) days, for Breaching Party to cure the breach or end the violation, and terminate this Agreement and the agreement between the parties for services if Breaching Party does not cure the breach or end the violation within the time specified by Terminating Party; or

    (2)    Immediately terminate this Agreement and the agreement between the parties for services if Breaching Party has breached a material term of this Agreement.

c.  **Effect of Termination.**

    (1)    Except as provided in Section 6(c)(2), upon termination of this Agreement, for any reason, Business Associate shall return or destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. If feasible, Business Associate agrees to proceed in accordance with Covered Entity's instruction to return or destroy PHI within thirty (30) days of receiving such information. If Covered Entity elects to have the PHI destroyed, Business Associate agrees to destroy the PHI in a manner mutually agreed upon by the Parties. Business Associate shall retain no copies of the PHI. This provision shall apply to PHI that is in the possession of Business Associate or agents and Subcontractors of Business Associate. If Business Associate elects to destroy the PHI, an officer of Business Associate shall certify to Covered Entity that the PHI has been destroyed.

    (2)    In the event that Business Associate determines that returning or destroying the PHI is not feasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible within fifteen (15) days. Upon written notice that return or destruction of PHI is infeasible, Business Associate shall extend the protections of this Agreement to such PHI and limit further Uses and



Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

(3)      Business Associate further agrees that no PHI, copies of PHI, or parts thereof, shall be retained when the aforementioned PHI are returned or destroyed.

## 7. CHANGES IN LAW

The parties agree to negotiate in good faith any modification to this Agreement that may be necessary or required to ensure consistency with amendments to and changes in applicable federal and state laws and regulations governing Protected Health Information, including without limitation, the HIPAA Security and Privacy Regulations and the HITECH Act and Regulations.

## 8. MISCELLANEOUS

a.      **Relationship of the Parties.** The parties acknowledge that their relationship is that of independent contractors. Neither party shall in any way represent itself as a partner, joint venturer, agent, employee or general representative of the other party.

b.      **Assignment.** This Agreement may not be assigned by either party, by operation of law or otherwise, without the prior written consent of the other party, except in connection with a change in control of a party's business, or that portion of a party's business giving rise to the HIPAA obligations hereunder, (whether through merger, sale of all or substantially all of the business and assets of the party or line of business, initial public offering, sale of stock or otherwise), and where written notice of such change in control has been provided to the other party. This Agreement shall be binding upon and shall inure to the benefit of the parties' successors and permitted assigns.

c.      **No Amendment.** This Agreement may not be changed, modified or amended except in a writing signed by both parties.

d.      **Severability** If any provision of this Agreement (or any portion thereof) is determined to be invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby and shall be binding upon Covered Entity and Contractor and shall be enforceable, as though said invalid or unenforceable provision (or portion thereof) were not contained in this Agreement.

e.      **Waiver.** The failure by either party to insist upon strict performance of any of the provisions contained in this Agreement will in no way constitute a waiver of its rights as set forth in this Agreement, at law or in equity, or a waiver of any other provisions or subsequent default by the other party in the performance of or compliance with any of the terms and conditions set forth in this Agreement. Either party's consent to or approval of any act by the other party requiring such party's consent or approval shall not be deemed to render unnecessary the obtaining of such consent or approval of any subsequent act.

f.      **Choice of Law.** This Agreement shall be construed, and the parties' rights shall be determined, in accordance with the laws of the State of California (without giving effect to principles of conflicts of law) and applicable federal law.

g.      **Counterparts.** This Agreement may be executed in one or more counterparts, which shall together constitute but one Agreement.

h.      **Headings.** The headings of this Agreement are intended solely for convenience of reference and shall be given no effect in the interpretation or construction of this Agreement.

# ⟨S⟩SAFEWAY

i. **Notices.** Any notice required or permitted hereunder shall be given by personal delivery, overnight delivery, or prepaid registered or certified mail (return receipt requested), addressed as follows:

If to Covered Entity:      Safeway Inc.
5918 Stoneridge Mall Rd., Bldg. G
Pleasanton, CA 94588
Legal Division – HIPAA Compliance
With CC to LP Director: Rick Whidden

If to Business Associate:     MarkeTouch Media, Inc.
5718 Westheimer Road
Suite 980
Houston, TX 77057
Attn: Charles Russo

or to such other addresses as either party may designate by written notice. Notices hereunder by personal delivery shall be effective upon receipt, and notice by mail shall be effective upon the date that the return receipt is signed.

j. **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and supersedes all prior discussions, agreements and understandings relating to such subject matter.

k. **Services Agreement.** Notwithstanding anything in this Business Associate Agreement to the contrary: (a) in the event of a conflict or inconsistency between the terms of this Business Associate Agreement and the RxTouch Service Agreement between the parties dated as of the Effective Date (as defined therein) (the "Service Agreement"), the terms of this Business Associate Agreement will govern; (b) any claim against Business Associate under this Business Associate Agreement (whether for indemnification, Breach, data breach or otherwise) shall be subject to the conditions and limitations contained in Section 8 of the Service Agreement; and (c) nothing in this Business Associate Agreement shall impose any obligation on Business Associate to comply with any telemarketing law, and the sole source for Business Associate's obligation to comply with any telemarketing law shall be contained in Section 6(b) of the Service Agreement (subject to certain representations, warranties and covenants of Covered Entity in Section 7 of the Service Agreement).

Covered Entity and Business Associate have caused this Agreement to be signed and delivered by their duly authorized representatives.

*[signature on next page]*

**SAFEWAY INC.**

By: _James McCabe_

Print Name: Jame's McCabe

Title: Director - Patient Care

Date: 09/24/2014

**MarkeTouch Media, Inc.**

By: _Charles E Russo_

Print Name: CHARLES E RUSSO

Title: Pres. Int

Date: 9/25/2014

EXHIBIT C

| Phone number | City | State | Delivered (local) | Attempts | Status | Result | Keycode | Name |
|---|---|---|---|---|---|---|---|---|
| 510-213-████ OKLD FRTVL | | CA | 11/6/2014 17:19 | 1 | Delivered | Machine | | |

SEWY000158

| Phone number | City | State | Delivered (local) | Attempts | Status | Result | Keycode | Name |
|---|---|---|---|---|---|---|---|---|
| 510-213- | OKLD FRTVL | CA | 1/9/2015 17:04 | 1 | Delivered | Machine | | |

SEWY000150

| Phone number | City | State | Delivered (local) | Attempts | Status | Result |
|---|---|---|---|---|---|---|
| 510213■ | OKLD FRTVL | CA | 1/9/2015 | 1 | Delivered | Machine |

SFWX000160

| Phone number | City | State | | Call Disposition |
|---|---|---|---|---|
| 510-213▮ | OKLD FRTVL | CA | Cellular | Machine |
| 510-213▮ | OKLD FRTVL | CA | Cellular | Machine |

SEWV000161